UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ASHIM KHATTRI CHETTRI, d/b/a
Tarala Internationals, and
WU LIXIANG,

                              Plaintiffs,

                -against-

NEPAL BANGLADESH BANK, LTD.,
NEPAL RASTRA BANK, AND
DEPARTMENT OF REVENUE
INVESTIGATION, GOVERNMENT OF NEPAL,
and CHASE MANHATTAN BANK,

                          Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 2, 2014

**MEMORANDUM
OPINION & ORDER**

10 Civ. 8470 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

           Plaintiffs Ashim Khattri Chettri, d/b/a Tarala Internationals ("Tarala"), and Wu

Lixiang ("Wu") bring this action against Nepal Bangladesh Bank, Ltd. ("NBB"), Nepal Rastra

Bank, the central bank of Nepal ("NRB"), the Department of Revenue Investigation,

Government of Nepal (the "DRI"), and Chase Manhattan Bank ("Chase"). Plaintiffs' claims

relate to a contract that the Government of Nepal purportedly entered into with Tarala, a

Colorado corporation, for the purchase of equipment for the Nepalese army and police. Tarala

subcontracted Wu, a Chinese businessman, to deliver the goods and wired $1 million to Wu's

NBB account. As set forth in paragraphs 1 and 4 of the Complaint, Plaintiffs allege that the DRI,

acting through NRB and NBB, wrongfully froze the transferred funds pursuant to a money

laundering investigation:

> 1. Plaintiff brings this action to recover for money and reputation damages
> suffered from the NEPAL RASTRA BANK, AND DEPARTMENT OF
> REVENUE INVESTIGATION, GOVERNMENT OF NEPAL's (hereafter
> "NEPAL") confiscation of $1,000,000.00 sent by TARALA via electronic
> wire transfer to the NEPAL BANGLADESH BANK, LTD (hereafter

> "BANK") with instructions to credit the amount to an account opened by "WU". With full knowledge and awareness of the source of the aforesaid funds and the normal course of business dealings established between NEPAL and TARALA, NEPAL, in bad faith, unreasonably and unjustifiably seized and confiscated the $1,000,000.00 over two years ago, thereby depriving TARALA and WU of the benefits of their business dealings with NEPAL and unjustly enriching NEPAL. . . .

4.   . . . Two (2) years have elapsed since NEPAL confiscated the funds from WU and no formal charges by NEPAL have been brought – the amount was merely frozen on the basis of some unfounded and disingenuous suspicion of money laundering.

(Cmplt. (Dkt. No. 1) ¶¶ 1, 4)

Plaintiffs filed this action on November 10, 2010, asserting claims against NRB and the DRI (collectively, "Defendants") for, inter alia, tortious interference with contract and violations of the Vienna Convention on the International Sale of Goods.

On February 15, 2011, this Court entered a default judgment against the DRI and NRB in the amount of $1,000,500.00.[1]  (Dkt. No. 27)  The DRI and NRB now move to vacate the default judgment and dismiss the Complaint on the grounds that, inter alia, (1) this Court lacks personal jurisdiction over them, because Plaintiffs did not comply with the service of process requirements of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1602 et seq.; (2) this Court lacks subject matter jurisdiction because, under the FSIA, the DRI and NRB are immune from suit; and (3) Plaintiffs did not establish their "right to relief by evidence satisfactory to the court," pursuant to 28 U.S.C. § 1608(e).  For the reasons stated below, Defendants' motion to vacate the default judgment and dismiss the Complaint will be granted.

---

[1]  The claims against Defendant Chase were dismissed by stipulation on February 17, 2011. (Dkt. No. 28)  A default judgment was entered against NBB in the amount of $1,000,500.00 on January 21, 2011.  (Dkt. No. 19)  NBB has not entered an appearance in this action and has not sought to challenge the default judgment.

## BACKGROUND

Plaintiff Tarala is the principal supplier of clothing and military equipment for the Government of Nepal.  (Cmplt. (Dkt. No. 1) ¶ 10; Affidavit of Dilli Raj Bhatta ("Bhatta Aff.") (Dkt. No. 42), Ex. B)  Chettri is Tarala's president.  (Chettri Aff. (Dkt. No. 44) ¶ 3)

Plaintiff Wu, a Chinese national, is the director of Constellation International Ltd., a Hong Kong-based company that helps coordinate the logistics of Tarala's international transactions.  (Cmplt. (Dkt. No. 1) ¶ 11)  Wu serves as Tarala's distribution partner, and is responsible for the delivery of goods and equipment to Tarala's customers.  (Id.)  Wu also conducts business with Nepal independently of his dealings with Tarala.  (Id.)

Defendants NRB and the DRI are political subdivisions or agencies of the Government of Nepal.  (Declaration of Gerald M. Levine ("Levine Decl.") (Dkt. No. 52) ¶¶ 3, 7)  NRB acts as the "banker, adviser, and financial agent for [the] Government of Nepal," and as such may "open and operate accounts [on behalf of the] Government of Nepal and other governmental bodies."  (Levine Decl., Ex. 1:  Nepal Rastra Bank Act, 2058 (2002) (Dkt. No. 52-1) §§ 5(g) ("Functions, Duties and Powers of the Bank"), 13 ("Operation of Accounts"))  NRB is authorized to issue letters of credit on the Government of Nepal's behalf and settle its obligations.  (Declaration of Yuba Raj Khatiwada, Governor of NRB ("Apr. 14, 2011 Khatiwada Decl.") (Dkt. No. 52-2) ¶¶ 4-5)  It does not, however, operate accounts for private individuals or conduct commercial activities for its own account.  (Id. ¶ 4)  The DRI serves as the prosecutorial arm of Nepal's Ministry of Finance and, among other things, monitors wire transfers for compliance with the Nepal Asset (Money) Laundering Prevention Act of 2008.  (Levine Decl. (Dkt. No. 52) ¶¶ 7, 9)

3

Between 2006 and 2008, the Nepalese army and police placed several purchase orders with Tarala for equipment such as batteries, radios, gas masks, ballistic helmets, and riot shields.  (See, e.g., Bhatta Aff., Ex. A & E (Dkt. Nos. 42-1 & 42-5))  In connection with these purchase orders, NRB issued irrevocable letters of credit to Chase, naming Tarala as beneficiary. (Cmplt. (Dkt. No. 1) ¶ 15; Bhatta Aff., Ex. E (Dkt. No. 42-5))  After receiving notice that a letter of credit had been issued, Tarala would instruct Wu to make arrangements with suppliers and other sub-agents to complete the transaction.  (Bhatta Aff. (Dkt. No. 42) ¶ 7)  Tarala would then draw upon the letters of credit by presenting an invoice demonstrating satisfactory delivery of the equipment.  (Cmplt. (Dkt. No. 1) ¶ 15)  Tarala contends that it received $1,675,427.00 from the Government of Nepal through these transactions.  (Id. ¶ 16)

In July 2008, Tarala wired $1 million from Chase to Wu's personal account at NBB.  (Cmplt. (Dkt. No. 1) ¶ 17)  Wu claims that he intended to use the funds to pay a third-party to transport equipment by truck from China to Nepal.  (Bhatta Aff., Ex. G (Dkt. No. 42-7) at 6-8)  According to documents submitted by Plaintiffs, a portion of that equipment related to a Tarala supply contract with the Government of Nepal that was secured by Letter of Credit No. 4133/64.  (Id., Ex. C (Dkt. No. 42-3) at 9, Ex. G (Dkt. No. 42-7) at 6)  The equipment was delivered in satisfaction of the supply contract and Tarala received payment from the Government of Nepal via a letter of credit issued by NRB.  (Apr. 14, 2011 Khatiwada Decl. (Dkt. No. 52-2) ¶ 6; Declaration of Dharma Raj Sapkota ("Sapkota Decl."), Ex. 1 (Dkt. No. 58-1) (spreadsheet showing $64,280.00 payment issued to Tarala on Sept. 16, 2008))

On August 4, 2008, NBB – based in Kathmandu -- sent a letter to NRB – also based in Kathmandu – notifying it of various "anomalies" NBB had discovered concerning Tarala's wire payment.  (Levine Decl., Ex. 3 (Dkt. No. 52-3))  NBB indicated that Wu had not

provided "appropriate document[ation] [regarding the] source of the [i]ncome," and that it had frozen the funds – then held in Wu's account at NBB's Bhainsepati Branch – pending an explanation of the source of the funds and further instruction from NRB. (Id.) On August 27, 2008, the DRI directed NRB to instruct NBB to "immediately freeze" Wu's account,"[o]n account of an on-going investigation." (Id., Ex. 5: Aug. 27, 2008 Translated Letter from the DRI to NRB (Dkt. No. 52-5)) As a result of the account freeze, Wu could not complete payment to the third-party for its delivery of supplies from China to Nepal. (Bhatta Aff., Ex. G (Dkt. No. 42-7) at 5)

Following the account freeze, Tarala attempted to demonstrate the legitimacy of the wire transaction and urged NBB to release the funds. Financial institutions and government agencies – including Chase, the United States Embassy in Nepal, and the Defense Attaché to the Embassy of the People's Republic of China in Nepal – sent letters attesting to the legitimacy of Tarala and Wu's business dealings in Nepal. (Cmplt. (Dkt. No. 1) ¶¶ 19-25; Bhatta Aff., Ex. K (Dkt. No. 42-11)) On February 25, 2011, however, the DRI charged Wu with violating the Asset (Money) Laundering Act and, pursuant to the Act, demanded confiscation of the disputed funds. (Levine Decl., Exs. 7 & 20: Charge Sheet filed in the Special Court, Babarmahal, Kathmandu pursuant to Section 22 (2) of Money Laundering Prevention Act, 2064 (Dkt. No. 52-7 & 52-20))

Plaintiffs filed the Complaint in this action on November 10, 2010, prior to the filing of criminal charges against Wu. (Dkt. No. 1) That same day, Plaintiffs' agent served the Summons and Complaint on both NRB and the DRI through the Office of the Consulate General of Nepal, located in New York. (Bhatta Aff., Ex. N: Affidavit of Gopal Shah (Dkt. No. 42-14) ¶ 2) Plaintiffs also arranged for a local process server to personally serve copies of the Summons and Complaint on the DRI's Registration Section in Kathmandu on November 15, 2010, and on

NRB's Registration and Dispatch Section in Kathmandu on November 19, 2010. (Id., Affidavit of Kalyan Pokhrel ¶¶ 2-6; id., Nov. 22, 2010 Proof of Service on the DRI)

On January 18, 2011, this Court ordered the DRI and NRB to show cause why a default judgment should not be entered against them. (Dkt. No. 17) According to Plaintiffs, the Order to Show Cause and supporting documents were served in three ways: (1) by sending copies by FedEx priority mail to NRB and the DRI offices in Kathmandu on January 20, 2011 (Bhatta Aff., Ex. R: Affirmation of Service (Dkt. No. 42-18)); (2) by personally serving copies at those offices through a local process server on January 21, 2011 (id., Ex. N: Affidavit of Process Server Bhim Datt Joshi (Dkt. No. 42-14)); and by sending copies by FedEx overnight to the Office of the Consulate General of Nepal in New York on January 24, 2011. (Bhatta Aff., Ex. S: Affirmation of Service (Dkt. No. 42-19)) Defendants NRB and the DRI did not respond by the court-imposed deadline.

On February 15, 2011, this Court entered a default judgment in favor of Plaintiffs, in the amount of $1,000,500.00. (Dkt. No. 27) The Clerk of the Court issued a writ of execution against NRB and the DRI, and the United States Marshals Service served the writ on Standard Chartered Bank in New York, levying on the rights, title, and interest which NRB and the DRI have in any funds, property, or assets held by Standard Chartered Bank. However, on April 1, 2011, based on an application from NRB, this Court ordered Plaintiffs to appear on April 20, 2011 to show cause "why an order should not be entered vacating the default judgment against [NRB] and [the DRI], and dismissing the complaint for lack of subject matter jurisdiction." (Dkt. No. 30) That same day, NRB moved for a stay of the default judgment pending the April 20 hearing. This Court granted that request in an April 4, 2011 order. (Dkt. No. 32)

6

At the April 20, 2011 hearing, this Court directed the parties to file supplemental briefs addressing whether the default judgment was properly entered pursuant to 28 U.S.C. § 1608(e).[2] The DRI and NRB filed a joint supplemental brief in support of their motion to vacate the default judgment against them and to dismiss the Complaint on May 5, 2011. (Dkt. No. 57) On May 27, 2011, the United States submitted a "Statement of Interest" urging vacatur of the default judgment and dismissal of the action. (Dkt. No. 62)

## DISCUSSION

The DRI and NRB move to set aside the February 15, 2011 default judgment pursuant to Fed R. Civ. P. 55(c) and 60(b), and to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), (2), (5), and (6) for lack of subject matter jurisdiction, lack of personal jurisdiction, insufficient service of process, and failure to state a claim. In the alternative, the DRI and NRB argue that this action should be dismissed on grounds of forum non conveniens. (Def. Br. (Dkt. No. 57) at 1)

## I.   LEGAL STANDARD FOR VACATING A DEFAULT JUDGMENT

Fed R. Civ. P. 55(c) provides that "[t]he court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." A court may vacate a default judgment under Rule 60(b) for any of six reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

---

[2] 28 U.S.C. § 1608(e) provides,

No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

(2) newly discovered evidence that, with reasonable diligence, could not have
been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or
misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an
earlier judgment that has been reversed or vacated; or applying it
prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed R. Civ. P. 60(b).

"Of these grounds for vacating default judgment, Rule 60(b)(4) is 'unique'

because 'relief is not discretionary and a meritorious defense is not necessary.'" Global Gold

Mining, LLC v. Ayvazian, 983 F. Supp. 2d 378, 384 (S.D.N.Y. 2013) (quoting Covington Indus.

v. Resintex A.G., 629 F.2d 730, 733 n.3 (2d Cir. 1980)). "'A judgment is void under Rule

60(b)(4) of the Federal Rules of Civil Procedure . . . if the court that rendered it lacked

jurisdiction of the subject matter, or of the parties, or if it acted in a manner inconsistent with due

process of law.'" City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 138 (2d Cir.

2011) (quoting Grace v. Bank of Leumi Trust Co. of N.Y., 443 F.3d 180, 193 (2d Cir. 2006)

(internal quotation marks and citation omitted)).

The Second Circuit has stated that "if the underlying judgment is void for lack of

jurisdiction, 'it is a per se abuse of discretion for a district court to deny a movant's motion to

vacate the judgment under Rule 60(b)(4).'" Id. (quoting Burda Media, Inc. v. Viertel, 417 F.3d

292, 298 (2d Cir. 2005) (internal quotation marks omitted)). "Furthermore, although a Rule

60(b)(4) motion must be made 'within a reasonable time,' courts have been 'exceedingly lenient

in defining the term "reasonable time,"' and have refused to apply the doctrine of laches as a bar

8

to relief under the rule," Velez v. Vassallo, 203 F. Supp. 2d 312, 318 (S.D.N.Y. 2002) (internal citation omitted) (quoting Beller & Keller v. Tyler, 120 F.3d 21, 23-24 (2d Cir. 1997)).

Although Defendants DRI and NRB do not cite specifically to Fed. R. Civ. P. 60(b)(4) in their motion to vacate, this Court construes their motion as arising under that provision.

## II.   THE DEFAULT JUDGMENT IS VOID DUE TO IMPROPER SERVICE

"'A judgment obtained in the absence of in personam jurisdiction is void.'" Orix Fin. Servs. v. Phipps, 91 CV 2523 (RPP), 2009 WL 2486012, at *2 (S.D.N.Y. Aug. 14, 2009) (quoting China Mariners Assur. Corp. v. M.T. W.M. Vacy Ash, 96 CIV. 9553 (PKL), 1999 WL 126921, at *3 (S.D.N.Y. Mar. 9, 1999) (citing Jaffe & Asher v. Van Brunt, 158 F.R.D. 278, 279 (S.D.N.Y. 1994)). "Valid service of process is a prerequisite to a district court's assertion of personal jurisdiction over a defendant." Am. Inst. of Certified Pub. Accountants v. Affinity Card, Inc., 8 F. Supp. 2d 372, 375 (S.D.N.Y. 1998) (citing Omni Capital Int'l v. Rudolf Wolff & Co., Ltd., 484 U.S. 97, 104 (1987)). "Hence, a judgment obtained by way of defective service is void for lack of personal jurisdiction and must be set aside as a matter of law." Id. (citing Howard Johnson Int'l, Inc. v. Wang, 7 F. Supp. 2d 336 (S.D.N.Y. 1998)).

### A.   Service of Process on the DRI and NRB

Fed. R. Civ. P. 4(j)(1) provides that "[a] foreign state or its political subdivision, agency, or instrumentality must be served in accordance with [Section 1608 of the FSIA]." Section 1608 sets forth the requirements for service on a foreign state and its political subdivisions, agencies, and instrumentalities. See 28 U.S.C. § 1608. Subsection (a) of Section 1608 governs service of process on a foreign state and its political subdivisions, while subsection (b) prescribes the methods for serving a foreign state's agencies or instrumentalities. As

9

explained below, because Plaintiffs did not comply with the requirements of subsection (a), the

DRI was not properly served with the Summons and Complaint, and because Plaintiffs did not

comply with the requirements of subsection (b) or demonstrate that NRB had actual notice of

this suit, NRB was likewise not properly served. Absent proper service, this Court lacks

personal jurisdiction over the DRI and NRB; accordingly, the default judgment must be vacated.

### 1. Service on the DRI was Improper

The DRI is a department within Nepal's Ministry of Finance. (Declaration of

Shanta Bahadur Shrestha, Director General of the DRI ("Shrestha Decl.") (Dkt. No. 59) ¶ 1)  It

therefore constitutes a political subdivision of the Government of Nepal. See First Nat. City

Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 626-27 (1983) (for FSIA

purposes, "[t]he [Cuban] Ministry of Foreign Trade is no different than the Government [of

Cuba] of which its minister is a member." (quoting Banco Nacional De Cuba v. Chase

Manhattan Bank, 505 F. Supp. 412, 425 (S.D.N.Y. 1980))); Garb v. Republic of Poland, 440

F.3d 579, 596 n.21 (2d Cir. 2006) ("existing case law hold[s] that departments or ministries of a

central government qualify as 'political subdivisions of a foreign state' under FSIA"); O'Connell

Machinery Co. v. M.V. "Americana", 734 F.2d 115, 116 (2d Cir. 1984) (the Istituto per la

Ricostruzione Industriale, "a public financial entity which coordinates the management of the

commercial enterprises of the Italian Government," is a political subdivision of Italy); Figueiredo

Ferraz Consultoria E Engenharia De Projeto Ltda. v. Republic of Peru, 655 F. Supp. 2d 361, 371

(S.D.N.Y. 2009), rev'd on other grounds and remanded sub nom. Figueiredo Ferraz E

Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384 (2d Cir. 2011) (Peru's Ministry of

Housing, Construction and Sanitation is a political subdivision of the Republic of Peru).

Section 1608(a) of the FSIA, which governs service on a foreign state or its

political subdivisions, authorizes the following methods of service:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

"Courts have been unequivocal that § 1608(a) 'mandate[s] strict adherence to its

terms, not merely substantial compliance.'" Lewis & Kennedy, Inc. v. Permanent Mission of

Republic of Botswana to United Nations, 05 CIV.2591(HB), 2005 WL 1621342, at *3 (S.D.N.Y.

July 12, 2005) (quoting Finamar Investors Inc. v. Republic of Tadjikistan, 889 F. Supp. 114, 117

(S.D.N.Y. 1995)); see also Hilaturas Miel, S.L. v. Republic of Iraq, 573 F. Supp. 2d 781, 796

(S.D.N.Y. 2008) (finding that Section 1608(a) "requires strict compliance"). For example,

Section 1608(a)(3) "designates [a foreign state's] Minister of Foreign Affairs as the only person

11

eligible to receive service. . . ." Lewis & Kennedy, 2005 WL 1621342, at *4 (finding improper

service where plaintiff failed to address process to the Minister of Foreign Affairs, and noting

that "[t]he statute is clear that a foreign ambassador to the United States or United Nations

cannot be construed as the Minister of Foreign Affairs"). Moreover, Section 1608(a)(3) requires

"translat[ion of] the summons, complaint, and notice of suit into the 'official language' of the

foreign state . . . ." Finamar Investors, 889 F. Supp. at 116 (quoting 28 U.S.C. § 1608(a)(3)).

Consequently, when documents are "served . . . in the wrong language, service of process [is]

defective." Id. at 118.

Here, there is no evidence that Plaintiffs complied with, or attempted to comply

with, Section 1608(a). Plaintiffs have pointed to no special arrangement for service between

themselves and the Government of Nepal, see 28 U.S.C. § 1608(a)(1), and there is no evidence

that service was attempted through an applicable international convention that governs service of

judicial documents in Nepal, see id. § 1608(a)(2). Moreover, Plaintiffs did not request the Clerk

of the Court to mail the Summons and Complaint – together with a Nepalese translation of the

same – to Nepal's Minister of Foreign Affairs, see id. § 1608(a)(3), nor did they ask the

Department of State to effect service of those papers through diplomatic channels, see id. §

1608(a)(4).

Plaintiff's submissions confirm that they did not strictly comply with the

requirements of Section 1608(a)(3). For example, Plaintiffs' affidavit and accompanying

exhibits show that personal service of the Summons and Complaint was attempted on Amrit Rai

at the Office of the General Consulate of Nepal in New York, and on Mukunda Prasad Pandel,

presumably an employee of the DRI, in Nepal. (Bhatta Aff., Ex. N (Shah Aff.) (Dkt. No. 42-14)

¶ 2; id. Nov. 22, 2010 Proof of Service on the DRI). Neither Rai nor Pandel is "the Minister of

Foreign Affairs of the foreign state concerned." Lewis & Kennedy, 2005 WL 1621342, at *4

("[A] foreign ambassador to the United States . . . cannot be construed as the Minister of Foreign

Affairs."). The record further demonstrates that Plaintiffs attempted to serve the January 18,

2011 Order to Show Cause by FedEx on the DRI and the Nepalese Consulate in New York, see

Affs. of Service (Dkt. Nos. 21 & 25), and by personal service on a DRI employee, see Aff. of

Service (Dkt. No. 23). Those methods likewise do not comply with Section 1608(a).

In opposing Defendants' motion to vacate, Plaintiffs do not address service under

Section 1608(a). Instead, they simply assert that the DRI "had actual notice of the [law]suit."

(Pltf. Opp. Br. (Dkt. No. 43) at 11) "Whether or not [a defendant] received actual notice of [a]

suit is irrelevant when strict compliance is required[, however]." Finamar Investors, 889 F.

Supp. at 118. Moreover, Plaintiffs' concession that they did not serve copies of process

translated into the official language of Nepal (Pltf. Opp. Br. (Dkt. No. 43) at 11) confirms that

service was improper. See id. ("Because petitioner did not comply with § 1608(a) when it served

the wrong entity in the wrong language, service of process was defective."). Accordingly,

service on the DRI was defective under Section 1608(a) of the FSIA, and the DRI's motion to

vacate must be granted.

### 2.     **Service on NRB was Improper**

The parties agree that NRB constitutes an "agency or instrumentality" of Nepal,

and that Section 1608(b) of the FSIA therefore governs the adequacy of service on NRB.

(Compare Pltf. Opp. Br. (Dkt. No. 43) at 9 with Def. Br. in Support of Order to Show Cause

Application (Dkt. No. 37) at 3)

Section 1608(b) of the FSIA sets forth the following methods of service on

agencies or instrumentalities of a foreign state:

13

    (1) by delivery of a copy of the summons and complaint in accordance
        with any special arrangement for service between the plaintiff and the
        agency or instrumentality; or

    (2) if no special arrangement exists, by delivery of a copy of the summons
        and complaint either to an officer, a managing or general agent, or to
        any other agent authorized by appointment or by law to receive service
        of process in the United States; or in accordance with an applicable
        international convention on service of judicial documents; or

    (3) if service cannot be made under paragraphs (1) or (2), and if
        reasonably calculated to give actual notice, by delivery of a copy of
        the summons and complaint, together with a translation of each into
        the official language of the foreign state –

        (A) as directed by an authority of the foreign state or political
            subdivision in response to a letter rogatory or request or

        (B) by any form of mail requiring a signed receipt, to be addressed and
            dispatched by the clerk of the court to the agency or
            instrumentality to be served, or

        (C) as directed by order of the court consistent with the law of the
            place where service is to be made.

28 U.S.C. § 1608(b).

        Plaintiffs have submitted five proofs of service concerning NRB: (1) a November

21, 2010 delivery of the Summons and Complaint by personal service to Raj Kumar Shrestha, an

NRB employee in Kathmandu, Nepal (Bhatta Aff., Ex. N (Nov. 21, 2010 Proof of Service on

NRB) (Dkt. No. 42-14)); (2) a November 22, 2010 delivery of the Summons and Complaint by

personal service to Amrit Rai, an employee of the Office of the General Consulate of Nepal,

which is located at 820 Second Avenue, Suite 17B, New York, NY 10017 (Aff. of Service (Dkt.

No. 5)); (3) a January 20, 2011 mailing via FedEx of the Order to Show Cause and supporting

documents (including the Complaint) to Shrestha in Nepal (Dkt. No. 22); (4) a January 21, 2011

delivery of the Order to Show Cause and supporting documents (including the Complaint) by

personal service to Shrestha in Nepal (Dkt. No. 24); and (5) a January 24, 2011 overnight

mailing via FedEx of the Order to Show Cause to the Consulate General of Nepal (Dkt. No. 26). None of these methods of service complies with Section 1608(b) of the FSIA.

Plaintiffs cannot avail themselves of Section 1608(b)(1), because no special arrangement for service exists between them and NRB.  Service was likewise not proper under Section 1608(b)(2), because Plaintiffs did not deliver a copy of the Summons and Complaint to "an officer . . . authorized by appointment or by law to receive service of process in the United States."  28 U.S.C. § 1608(b)(2) (emphasis added).  Service of the Summons and Complaint on Amrit Rai at the Consulate General of Nepal in New York is not sufficient, because neither Mr. Rai nor the Consulate itself is authorized to accept legal process on NRB's behalf.  (Affidavit of Khagendra Gharti-Chhetry ("Gharti-Chhetry Aff.") (Dkt. No. 33), Ex. H (Declaration of Amrit Rai) ¶ 6)  Service on Mr. Shrestha is likewise not sufficient, because he is located in Nepal – not "in the United States" – and, in any event, is not authorized to receive service of process on behalf of NRB.  (See Gharti-Chhetry Aff. (Dkt. No. 33), Ex. B (Declaration of Yuba Raj Khatiwada, Governor of NRB) ("Mar. 31, 2011 Khatiwada Decl.") ¶ 11)

Plaintiffs have also not complied with the requirements of Section 1608(b)(3).  "Service of process under [subsection] [(b)](3) is properly effectuated by (1) any form of mail requiring return receipt, (2) reasonably calculated to give actual notice, which (3) includes a translation of both the summons and complaint in the official language of the foreign state, and (4) was dispatched by the clerk of the court."  Sakhrani v. Takhi, 96-CV-2900(KMW)(RLE), 1997 WL 33477654, at *6 (S.D.N.Y. Sept. 10, 1997).  Here, the mailings sent to NRB and the Consulate of Nepal did not provide for a return receipt; the mailings were not reasonably calculated to give actual notice, because they were addressed to employees not authorized to

15

receive service; the documents were not translated into the official language of Nepal; and the mailings were not dispatched by the Clerk of this Court.

Courts in this and other Circuits have, however, upheld service on foreign instrumentalities where "the serving party 'substantially complied' with the requirements of the FSIA." Finamar Investors, 889 F. Supp. at 117; see also First City, Texas Houston, N.A. v. Rafidain Bank, 281 F.3d 48, 55 (2d Cir. 2002) (finding proper service under Section 1608(b)(1) where "compliance . . . may not have been exact . . . [but it was] substantial and sufficient"); Harris Corp. v. National Iranian Radio and Television, 691 F.2d 1344, 1352 (11th Cir. 1982) ("The failure to follow precisely those steps in [Section] 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case notice was actually received.").

"When applying the substantial compliance test," "the primary factor is whether the defendant receive[d] actual notice and was not prejudiced by the lack of compliance with FSIA." Sakhrani, 1997 WL 33477654, at *6 (citing Straub v. A.P. Green. Inc., 38 F.3d 448, 453 (9th Cir. 1994)); see also Sherer v. Construcciones Aeronauticas, S.A., 987 F.2d 1246, 1249 (6th Cir. 1993) (noting that courts have disagreed as to whether Section 1608(b) requires "substantial" or "strict" compliance, but that "[t]he common theme running through the vast majority of these cases, whether 'substantial compliance' or 'strict compliance,' is the importance of actual notice to the defendants"). "In other words, the reasoning behind the substantial compliance test is 'that a technical defect in service should not override the fact that the defendant received actual notice' of the lawsuit." Sakhrani, 1997 WL 33477654, at *6 (quoting Sherer, 987 F.2d at 1249).

16

In <u>Banco Metropolitano, S.A. v. Desarollo de Autopistas y Carreteras de</u>

<u>Guatemala</u>, 616 F. Supp. 301 (S.D.N.Y. 1985), the court found that "[i]n view of service on the

consulate in New York . . . [and] the receipt of <u>actual</u> knowledge of the summons and complaint

in Guatemala, albeit not in a Spanish version . . . [and not] mail[ed] by the clerk of the court,

substantial compliance ha[d] been achieved." <u>Id.</u> at 304 (emphasis added). On the other hand, in

<u>Sakhrani</u>, 1997 WL 33477654, at *7, substantial compliance was not found where a "plaintiff . . .

failed to establish through a sufficiency of evidence that [the] defendant . . . had actual

knowledge," and "[t]he only evidence of service that the plaintiff . . . provided . . . [was] copies

of a postal service inquiry which found that the original complaint and summons were received

and signed by three different people." <u>See also Straub</u>, 38 F.3d at 454 (finding insufficient

evidence of actual notice where the summons and complaint were received and signed for at the

defendant's corporate headquarters).

Defendant NRB "acknowledge[s] that the standard for [complying with the

requirements of] Section 1608(b) is 'substantial compliance'" (Def. Supplemental Br. (Dkt. No.

57) at 11 n.12), but "expressly denies" receiving actual notice of the lawsuit prior to entry of

default judgment. (Def. Reply Br. (Dkt. No. 53) at 7). Plaintiffs, on the other hand, contend that

NRB "received actual notice" and that any technical defects in service should therefore be

excused. (Pltf. Opp. Br. (Dkt. No. 43) at 10-11)

Here, unlike in <u>Banco Metropolitano</u>, Plaintiffs have "failed to establish through a

sufficiency of evidence that [Defendant NRB] had actual knowledge or notice of the summons

and complaint." <u>Sakhrani</u>, 1997 WL 33477654, at *7. Plaintiffs do not dispute that they failed

to comply with the requirements for service under Section 1608(b). In particular, Plaintiffs

concede that they did not prepare translated copies of the Summons and Complaint or arrange for

the Clerk of the Court to send these documents to NRB. While the Banco Metropolitano court excused such service defects as inconsequential, the plaintiff in that case established that the defendant had "actual knowledge" by presenting evidence that its legal advisor had met plaintiff's process servers and instructed them to serve process on the Guatemalan consulate in New York. Banco Metropolitano, 616 F. Supp. at 304.

Here, Plaintiffs have made no such showing. The record demonstrates that Plaintiffs attempted to serve the Summons and Complaint on Shrestha – the "Assistant Director" of NRB's "Registration and Dispatch Section" in Nepal – who purportedly informed Plaintiffs' process server that he had the power to accept the foreign process and that the documents had to be officially registered with his office. (Bhatta Aff., Ex. N (Affidavit of Kalyan Pokhrel) (Dkt. No. 42-14) ¶¶ 2-5) Defendants have offered evidence that Shrestha worked "at a local branch of the NRB in Nepal" and not at the "NRB's Central Office" (Gharti-Chhetry Aff. (Dkt. No. 33), Ex. B (Mar. 31, 2011 Khatiwada Decl.) (Dkt. No. 33) ¶ 11), however, and that he was not authorized "by appointment or by law" to accept service or to give direction as to how service on NRB should be made. (Id.) Defendants have also provided an affidavit from the Director of NRB's Legal Division – which "prepares legal documents for submission to . . . courts" and thus would be responsible for responding to Plaintiffs' summons and complaint – "affirm[ing] that the Central Office/Legal Division did not receive any service of the summons or any other documents." (Affidavit of Dharma Raj Sapkota ("Sapkota Aff.") (Dkt. No. 52-17) at ¶¶ 2, 4)

Plaintiffs argue, however, that there can be "no doubt that NRB . . . had actual notice of the suit," asserting that "[t]he NRB Governor admits receipt of the documents through its officer. . . ." (Pltf. Opp. Br. (Dkt. No. 43) at 11) Plaintiffs mischaracterize the Governor's declaration, however, which states that although service "was purportedly made on Mr. Raj

18

Shrestha at a local branch of the NRB," Shrestha "has no authority . . . to accept legal papers for NRB." The Governor goes on to state that "NRB recently learned about the U.S. Marshal's warrant and garnishment on the account of NRB at the Standard Chartered Bank in New York." (Gharti-Chhetry Aff. (Dkt. No. 33), Ex. B (Mar. 31, 2011 Khatiwada Decl.) (Dkt. No. 33) ¶¶ 11, 7)

Plaintiffs further contend that "NRB has [not] denied that it had actual notice." (Pltf. Opp. Br. (Dkt. No. 43) at 11)  NRB's reply brief and its counsel's April 14, 2011 declaration, however, both assert that NRB lacked actual notice. (See Def. Reply Br. (Dkt. No. 53) ("NRB expressly denies 'actual notice' or awareness of the lawsuit. . . ."); Levine Decl. (Dkt. No. 52) ¶¶ 17-24)  Finally, Plaintiffs cite three news articles (Pltf. Opp. Br. (Dkt. No. 43) at 11 (citing Dkt. No. 42, Exs. Q, U, T)) – all published after this Court's entry of a default judgment against Defendants NRB and the DRI – in which Plaintiffs claim that these defendants "boldly declared that they knowingly and voluntary[il]y refused to respond. . . ." (Pltf. Opp. Br. (Dkt. No. 43) at 11)  None of these articles support Plaintiffs' account, however.

Because "a default judgment is 'the most severe sanction which the court may apply,'" New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005) (quoting Cody v. Mello, 59 F.3d 13, 15 (2d Cir. 1995) (citations omitted)), "in ruling on a motion to vacate a default judgment, all doubts must be resolved in favor of the party seeking relief from the judgment in order to ensure that, to the extent possible, disputes are resolved on their merits." Id. (citation omitted).  Here, the record does not demonstrate that NRB had actual notice of this action.  Accordingly, this Court must credit NRB's assertion that it lacked such notice and vacate the default judgment as void due to lack of proper service.

19

## III.   THE DEFAULT JUDGMENT IS VOID FOR
##         LACK OF SUBJECT MATTER JURISDICTION

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in

federal court[.]" Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439

(1989). Under the FISA, a "foreign state shall be immune from the jurisdiction of the courts of

the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

28 U.S.C. § 1604. Accordingly, "if none of the exceptions to immunity applies, the court lacks

both subject matter jurisdiction and personal jurisdiction." Cargill Int'l S.A. v. M/T Pavel

Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993) (citing Verlinden B.V. v. Central Bank of Nigeria,

461 U.S. 480, 485 n.5 (1983)); see also Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)

("Under the Act, a foreign state is presumptively immune from the jurisdiction of United States

courts; unless an exception applies, a federal court lacks subject-matter jurisdiction over a claim

against a foreign state." (citing Verlinden, 461 U.S. at 488-89)).

In a motion to dismiss for lack of subject matter and personal jurisdiction under

the FSIA, "the defendant must present a 'prima facie case that it is a foreign sovereign,' after

which the plaintiff 'has the burden of going forward with evidence showing that, under

exceptions to the FSIA, immunity should not be granted.'" Virtual Countries, Inc. v. Republic of

S. Africa, 300 F.3d 230, 241 (2d Cir. 2002) (quoting Cargill, 991 F.2d at 1016) (emphasis in

Virtual Countries). "Where the plaintiff satisfies her burden that an FSIA exception applies, the

foreign sovereign then bears the ultimate burden of persuasion that the FSIA exception does not

apply." Swarna v. Al-Awadi, 622 F.3d 123, 143 (2d Cir. 2010). In considering such a motion,

the "district court 'retains considerable latitude in devising the procedures it will follow to ferret

out the facts pertinent to jurisdiction.'" APWU v. Potter, 343 F.3d 619, 627 (2d Cir. 2003)

(quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000)).

20

"This discretion includes the ability to 'resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits.'" Freund v. Republic of France, 592 F. Supp. 2d 540, 553 (S.D.N.Y. 2008) (quoting Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998)).

Plaintiffs argue that two FSIA exceptions apply here: (1) the "commercial activity" exception set forth in Section 1605(a)(2); and (2) the "takings" exception set forth in Section 1605(a)(3).  (Pltf. Opp. Br. (Dkt. No. 43) at 6-8)

## A.  The "Commercial Activity" Exception Does Not Apply

Under Section 1605(a)(2), a foreign state shall not be immune from the jurisdiction of the courts of the United States where

> . . . the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (alterations added).  In their opposition papers, Plaintiffs rely on the second of these three alternative grounds.  (Pltf. Opp. Br. (Dkt. No. 43) at 6)

Section 1603(d) of the FSIA defines a "commercial activity" as

> either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).

In determining whether a foreign entity's conduct constitutes "commercial activity" within the meaning of the FSIA, courts must consider whether the activity at issue "is the 'type of action[ ] by which a private party engage[s] in trade and traffic or commerce.'"

21

Hilaturas Miel, 573 F. Supp. 2d at 794 (alterations in original) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)); see Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171, 176 (2d Cir. 2010) (noting that the commercial activity exception applies when a "'foreign government acts, not as a regulator of a market, but in the manner of a private player within it'") (quoting Weltover, 504 U.S. at 614).

　　　　　"[A] state's confiscation of property within its borders is not a 'commercial' act." Garb v. Republic of Poland, 440 F.3d 579, 598 (2d Cir. 2006); see Pena-Perez v. Procuraduria Gen. De Justicia of Nicaragua, 96 Civ. 0168 (KTD), 1997 WL 122823, at *2 (S.D.N.Y. Mar. 17, 1997) ("Expropriation is a quintessentially sovereign act and is never viewed as having commercial character." (citing Carey v. Nat'l Oil Corp., 453 F. Supp. 1097, 1102 (S.D.N.Y. 1978), aff'd, 592 F.2d 673 (2d Cir. 1979)). Accordingly, a "'government . . . act[s] purely as a sovereign regulator when it fr[eezes] the assets of [foreign] citizens.'" Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany, 05CIV.10669(GEL), 2007 WL 2822214, at *5 (S.D.N.Y. Sept. 27, 2007), aff'd, 615 F.3d 97 (2d Cir. 2010) (alterations added) (quoting Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 168 (D.C. Cir. 1994)); see also Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 223 n.10 (S.D.N.Y. 1997) ("Actions that are solely sovereign or governmental in nature, such as a government freeze on assets . . . would interfere with contract rights but may not be commercial in nature.").

　　　　　Here, Plaintiffs argue that the commercial activity exception applies, because "Defendants contracted with a U.S. based company owned by [a] U.S. citizen" and "must have foreseen . . . [that] they could . . . be sued in the United States." (Pltf. Opp. Br. (Dkt. No. 43) at 6-7) Plaintiffs further contend that the assets frozen in Nepal are "part and parcel of the contract of the said commercial transaction." (Id. at 7)

22

Plaintiffs' arguments are not persuasive. "As a threshold step in assessing [P]laintiffs' reliance on the 'commercial activity' exception," this Court "must identify the act of the foreign sovereign State that serves as the basis for [P]laintiffs' claims." Garb, 440 F.3d at 586 (2d Cir. 2006) (alterations added). According to the Second Circuit, the "based upon" language of Section 1605(a)(2) "requires a 'degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is considerably greater than common law causation requirements.'" Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 156 (2d Cir. 2007) (quoting Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp., 204 F.3d 384, 390 (2d Cir. 2000)) (emphasis in Kensington). "This 'degree of closeness' must exist between the commercial activity and the gravamen of the plaintiff's complaint." Id. (citations omitted).

Here, the "gravamen" of the Complaint is not Tarala's supply contracts with the Government of Nepal, but rather the DRI and NRB's freeze of the $1 million held in Wu's account at NBB. See Cmplt. (Dkt. No. 1) ¶ 1. Moreover, all of the acts relating to the seizure of Wu's account took place in Nepal. The entities responsible for the freeze – the DRI and NRB – are located in Nepal, and Wu's account is located at the Bhainsepati Branch of NBB in Nepal. Plainly, the freeze imposed on Wu's account was not "an act performed in the United States." Accordingly, the second clause of Section 1605(a)(2) is not applicable.

Although Plaintiffs have not argued that the third clause of Section 1605(a)(2) applies, this Court will nonetheless consider whether this provision – which addresses a foreign state's acts outside the United States, in connection with commercial activity, that cause a direct effect in the United States – provides a basis for this Court to exercise subject matter jurisdiction.

23

To establish the applicability of the commercial activity/direct effect exception, a plaintiff must show that the operative act (1) occurred outside the United States; (2) "in connection with a commercial activity of the foreign state"; and (3) "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

The Second Circuit has stated that the "in connection with" element is "a term of art" that should be "interpret[ed] . . . narrowly." Garb, 440 F.3d at 587. "Acts are in connection with . . . commercial activity so long as there is a substantive connection or a causal link between them and the commercial activity." Hanil Bank v. Pt. Bank Negara Indonesia (Persero), 148 F.3d 127, 131 (2d Cir. 1998) (citations and internal quotation marks omitted). However, the term does not apply to "tangential commercial activities to which the acts forming the basis of the claim have only an attenuated connection." Drexel Burnham Lambert Grp. Inc. v. Comm. of Receivers for Galadari, 12 F.3d 317, 330 (2d Cir. 1993) (internal quotation marks omitted).

As to the "direct effect" element, "'an effect is direct if it follows as an immediate consequence of the defendant's . . . activity.'" Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 138 (2d Cir. 2012) (quoting Weltover, 504 U.S. at 618). "The Second Circuit has articulated . . . a heightened 'direct effect' test, which has been termed the 'legally significant act' test and is designed to assess 'whether the direct impact of a foreign state's . . . activity was felt in the United States.'" Lantheus Med. Imaging, 841 F. Supp. 2d 769, 790 (S.D.N.Y. 2012) (quoting Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 75 (2d Cir. 2010)). "The test . . . seeks to differentiate between a direct effect felt in the United States and a scenario in which 'a foreign state's commercial activity outside of the United States cause physical or financial injury to a United States citizen.'" Id. (quoting Guirlando, 602 F.3d at 78). Where "there is no evidence that [defendant's] activities [abroad] intended or contemplated a specific effect in the United

24

States," a direct effect does not occur. Filetech S.A. v. France Telecom, S.A., 212 F. Supp. 2d 183, 197 (S.D.N.Y. 2001); see Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993) (no direct effect where the "legally significant act" of detaining plaintiffs' plane and demanding payment occurred in Nigeria; because "[t]he Nigerian authorities were indifferent to the geographic location of the source of the money," the "sole act connected to the United States . . . [was] entirely fortuitous").[3]

Here, as noted earlier, the "act . . . that serves as the basis for [P]laintiffs' claims," Garb, 440 F. 3d at 586, is Defendant NRB and the DRI's freezing of Wu's account at NBB. As discussed above, that action took place in Nepal. Accordingly, the operative act took place outside the United States, and the first element of the commercial activity/direct effect exception is satisfied.

As to the second element -- whether the operative act took place "in connection with a commercial activity of the foreign state" – Plaintiffs argue that, in taking this action, Defendants tortiously interfered with the contractual relationship between Tarala and Wu.

---

[3] A "direct effect" in the United States has frequently been found in cases "involving default by a foreign state or its instrumentality on its commercial obligations, . . . [and where] the defaulting party is contractually obligated to pay in this country." Rogers, 673 F.3d at 139 (collecting cases). In this line of cases, "'the ultimate object of the [breached] contract . . . was the payment of funds in the United States.'" Id. (quoting Filetech, 212 F. Supp. 2d at 197). However, in the context of tort actions, "'the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the [commercial activity] exception.'" Guirlando, 602 F.3d at 78 (quoting Antares Aircraft, 999 F.2d at 36); see also Martin v. Republic of South Africa, 836 F.2d 91 (2d Cir. 1987) (financial loss to person injured abroad is not a "direct effect" in United States); Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1185 (D.C. Cir. 2013) (finding that "the FSIA's 'direct effect' requirement is not satisfied when a 'plaintiff's U.S. citizenship furnished the only connection between the commercial activity and the United States'" (quoting Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada, 600 F.3d 661, 665 (D.C. Cir. 2010)). No "direct effect" exists where "the sole act connected to the United States . . . is entirely fortuitous and entirely unrelated to the liability of the [defendants]." Guirlando, 602 F.3d at 77 (quoting Antares Aircraft, 999 F.2d at 36).

25

Plaintiffs further allege – in conclusory terms – that the freeze amounts to a "breach[ of] the international sales contract." (Pltf. Opp. Br. (Dkt. No. 43) at 5)  Plaintiffs have not pleaded facts demonstrating that the asset freeze – imposed as the result of a money laundering investigation – had a "substantive connection" or a "causal link" to Tarala's supply contracts with the Government of Nepal, however. See Garb, 440 F.3d at 587 (finding no substantive connection between the Polish Government's sovereign expropriation of property and its subsequent commercial management of those properties).  Moreover, Defendants have offered evidence that Tarala received full payment for all its contracts with Nepal via NRB's letters of credit (Apr. 14, 2011 Khatiwada Decl. ¶ 6 (Dkt. No. 52-2); Sapkota Decl., Ex. 1 (Dkt. No. 58-1)), and Plaintiffs do not argue otherwise.

To the extent that Plaintiffs claim that Wu suffered a financial injury as a result of Defendants' actions, there is no doubt that – in freezing financial assets within Nepal's borders – the DRI and NRB were acting "purely as . . . sovereign regulator[s]"; they were not engaging in the type of conduct that private parties engage in. Mortimer Off Shore Servs., 2007 WL 2822214, at *5.  Accordingly, the operative act giving rise to Plaintiffs' complaint did not occur "in connection with the commercial activity of [a] foreign state." 28 U.S.C. § 1605(a)(2).

Even if the asset freeze had occurred in connection with Nepal's commercial activity, Plaintiffs have not adequately alleged a "direct effect" in the United States. As the Second Circuit has stated, "the mere fact that a foreign state's . . . activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." Guirlando, 602 F.3d at 78. In illustrating this precept, the Guirlando court cited the Second Circuit's reasoning in an earlier case involving a tort claim arising from the conversion of the plaintiff's airplane in Nigeria:

26

"[T]he direct effect of detaining the plane was . . . the loss of the use of the
aircraft and the physical damage it suffered in Nigeria, and not, as Antares
alleges, the financial loss that Antares suffered in the United States. . . .
The transfer of funds out of Antares' New York bank account, and the
resultant financial loss to the partnership, are not by themselves sufficient
to place the effect of the defendants' conduct 'in the United States' within
the meaning of § 1605(a)(2)."

Guirlando, 602 F.3d at 78 (emphasis omitted) (quoting Antares Aircraft, L.P. v. Fed. Republic of

Nigeria, 948 F.2d 90, 95 (2d Cir. 1991)).

The Second Circuit's reasoning applies with equal force here. Contrary to

Plaintiffs' assertions (Pltf. Opp. Br. (Dkt. No. 43) at 11), the direct effect of the operative

conduct – the DRI and NRB's freezing of Wu's account at NBB – was not any financial loss that

Tarala suffered in the United States. Instead, the direct effect of the freeze was that it prevented

Wu's use of the funds in his account, including to pay third-party subcontractors in Nepal for the

delivery of supplies in satisfaction of Tarala's supply contracts. (Bhatta Aff., Ex. G (Dkt. No.

42-7) at 5)  In sum, Plaintiffs have pled no facts demonstrating that Defendant's "activities

[abroad] intended or contemplated a specific effect in the United States." Filetech, 212 F. Supp.

2d at 197.

The commercial activity exception set forth in Section 1605(a)(2) is not

applicable here, and provides no basis for this Court's exercise of subject matter jurisdiction.

### B.    The "Takings" Exception Does Not Apply

In order to establish that the "takings" exception of the FSIA, 28 U.S.C. §

1605(3), is applicable, a plaintiff must demonstrate

(1) that rights in property are at issue; (2) that the property was
"taken"; (3) that the taking was in violation of international law;
and either (4)(a) "that property . . . is present in the United States
in connection with a commercial activity carried on in the United
States by the foreign state," or (4)(b) "that property . . . is owned or
operated by an agency or instrumentality of the foreign state and

27

> that agency or instrumentality is engaged in a commercial activity
> in the United States[.]

Garb, 440 F.3d at 588 (emphasis added) (quoting 28 U.S.C. § 1605(a)(3) and citing Zappia
Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 251 (2d Cir. 2000)).

Although "the FSIA does not define the term 'taken,'" the Second Circuit has
interpreted the term as "refer[ing] to 'the nationalization or expropriation of property without
payment of the prompt adequate and effective compensation required by international law.'"
Zappia, 215 F.3d at 251 (citing H.R. Rep. No. 94-1487, at 19 (1976)). "A violation of
international law first requires . . . that the taking not be for a public purpose, or that the taking
be discriminatory, or not accompanied by provision for just compensation." Smith Rocke Ltd. v.
Republica Bolivariana de Venezuela, 12 Civ. 7316 (LGS), 2014 WL 288705, at *7 (S.D.N.Y.
Jan. 27, 2014) (emphasis and citation omitted). In short, "the 'taking' must be done by a
sovereign – not a private entity – in a manner that 'deprive[s] a plaintiff of property without
adequate compensation.'" Freund, 592 F. Supp. 2d at 554 (quoting Zappia, 215 F.3d at 251)
(alteration in Freund).

Not every deprivation of personal property qualifies as a "taking," however, let
alone a violation of international law. Indeed, some actions by a government "'in the regulation
of its internal affairs'" may "'serve a public purpose . . . so strong as to render lawful what
otherwise might constitute a "'taking.""'" Greenpeace, Inc. (U.S.A.) v. State of France, 946 F.
Supp. 773, 782 (C.D. Cal. 1996) (quoting West v. Multibanco Comermex, S.A., 807 F.2d 820,
831 (9th Cir. 1987)) (rejecting plaintiffs' claim that French Government's "indefinite seizure" of
their ship constituted a "taking"; "[France] had a purpose in mind . . . recognized in international
law as justifying even severe . . . restrictions on the use of property" when it launched an
investigation into plaintiffs' alleged violations of international law).

28

Here, Plaintiffs broadly contend that the takings exception applies because NRB and the DRI expropriated their property "in violation of international law." (Pltf. Opp. Br. (Dkt. No. 43) at 9)  They do not explain, however, how any such violation resulted from the freezing of Wu's account in Nepal pursuant to an ongoing money laundering investigation being conducted by an arm of the Government of Nepal.  Plaintiffs merely assert that the freeze was "discriminatory," "not for a public purpose," and was "not accompanied by  . . . just compensation."  (Id. at 8)  Plaintiffs plead no facts to support these conclusory allegations, however.  In addition to insufficient factual allegations, Plaintiff's "takings" exception argument fails for several other reasons.

As an initial matter, the "takings" exception of the FSIA cannot be applied to actions of the DRI.  As discussed above, the DRI is a department within Nepal's Ministry of Finance and is a political subdivision of the Government of Nepal.  See Garb, 440 F.3d at 596 n.21 (2d Cir. 2006) ("[E]xisting case law hold[s] that departments or ministries of a central government qualify as 'political subdivisions of a foreign state' under [the] FSIA.").  For the "takings" exception to apply, the Second Circuit requires – under prong 4(b) – that the property be "owned or operated by an agency or instrumentality of the foreign state."  Garb, 440 F.3d at 588 (emphasis added).  Where the defendant is "the foreign state itself or a subdivision of it" and "not an agency or instrumentality . . . , plaintiff's claims fail to satisfy . . . the 'takings exception.'"  Id. at 589, 590 (rejecting plaintiff's "takings" exception argument because "the Ministry of the Treasury of Poland is not 'an agency or instrumentality' . . . within the meaning of the FSIA); see Freund, 592 F. Supp. 2d at 562 ("takings" exception not applicable because "France is not an 'agency or instrumentality' of itself").  Accordingly, the "takings" exception

does not provide a basis for this Court to exercise subject matter jurisdiction over claims against the DRI.

As to Plaintiffs' claim against NRB, courts have held that "a claimant cannot complain that a taking or other economic injury has not been fairly compensated, and hence violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." Greenpeace, Inc. (U.S.A.), 946 F. Supp. at 783 (citing Interhandel Case (Switzerland v. United States) [1959] I.C.J.Rep. 6, 26-27 (the State where the violation has occurred should have an opportunity to redress takings by its own means, within the framework of its own domestic legal system); Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. F). There is no evidence here that Plaintiffs have pursued remedies that may be available to it in Nepal.

In any event, as to NRB, Plaintiffs have not met their burden to demonstrate that the freezing of Wu's account constitutes a taking that violates international law. See Freund, 592 F. Supp. 2d at 552 ("[o]nce the [defendant] makes [a] showing [that it is a foreign state or entity under the FSIA], [plaintiff] 'has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted'" (quoting Cabiri v. Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999)).

According to the Second Circuit, a "taking" entails "the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law." Zappia, 215 F.3d at 251 (citation omitted). While Plaintiffs have pleaded facts demonstrating that NRB's conduct deprived Wu of access to his NBB account, they have cited no authority suggesting that a freeze of financial assets pursuant to an ongoing criminal money laundering investigation constitutes a "nationalization or expropriation" for

30

purposes of the "takings" exception. While the DRI and NRB began their investigation of

Tarala's $1 million wire transfer to Wu's account in August 2008, and while criminal charges

were filed against Wu in February 2011, Nepalese law permits "[c]onfiscation of [money

laundering] proceeds . . . only at the verdict of the Court in Nepal." (Apr. 14, 2011 Khatiwada

Decl. (Dkt. No. 52-2) ¶ 5)  Between 2008 and 2011, the assets in Wu's account were frozen

pursuant to an open criminal investigation of Wu being conducted by the Government of Nepal.

See Id. ¶ 6.  There is no evidence suggesting otherwise.

Moreover, in wiring $1 million to an account Wu had opened at NBB, Plaintiffs

"voluntarily subject[ed] [themselves] to a known obligation" to be bound by and comply with the

laws and regulations created, imposed, and enforced by agencies of the Nepalese Government.

Meriden Trust & Safe Deposit Co. v. F.D.I.C., 62 F.3d 449, 455 (2d Cir. 1995).  Because the

investigation of Tarala's wire transfer to Wu was a "foreseeable result" of Plaintiffs' submission

to Nepalese law – including those provisions addressing money laundering – "the attachment of

[Wu's account for the duration of the criminal investigation and proceedings] . . . does not make

it a taking under the Fifth Amendment."  Weinstein v. Islamic Republic of Iran, 624 F. Supp. 2d

272, 278 (E.D.N.Y. 2009) aff'd, 609 F.3d 43 (2d Cir. 2010) (citation omitted).

Plaintiffs complain that the Defendants "deliberately prolonged" the dispute,

noting the more than two-year gap between the initial freeze and the filing of money laundering

charges. (Pltf. Opp. Br. (Dkt. No. 43) at 13)  The length of the freeze here does not demonstrate

that a taking occurred, however.  The record indicates that the Nepalese investigators conducted

an active investigation during the 2008 to 2010 time period.[4]  Plaintiffs cite no authority

---

[4]  The Money Laundering Charge Sheet (Levine Decl., Ex. 7 (Dkt. Nos. 52-7 & 52-20)) indicates
that Nepalese investigators obtained statements and other documents from Bhagawati Traders,
Wu's local agent in Nepal, on February 9, 2009 (id. at 39); interviewed a representative of Tarala

suggesting that a freeze of assets for a two year period – while an active criminal investigation is

proceeding – constitutes a taking for purposes of the "takings" exception of the FSIA.[5]

\*   \*   \*   \*

Because neither the "commercial activity" exception nor the "takings" exception

of the FSIA are applicable here, the default judgment is void for lack of subject matter

jurisdiction.

## CONCLUSION

For the reasons stated above, the motion of Nepal Rastra Bank and the

Department of Revenue Investigation, Government of Nepal, to vacate the default judgment as

void pursuant to Fed. R. Civ. P. 60(b) is granted, and the Complaint is dismissed. See First Fid.

Bank, N.A. v. Gov't of Antigua & Barbuda--Permanent Mission, 877 F.2d 189, 196 (2d Cir.

1989) ("A decision that a default judgment is void for want of jurisdiction must be accompanied

---

at the DRI's offices in Nepal on December 27, 2009 (id. at 16); interviewed Wu himself at the
DRI's offices in Nepal on June 17, 2010 (id. at 18); and interviewed Shiwa Mandal, a
construction contractor allegedly hired by Wu, on June 29, 2010 (id. at 24-27).

[5] There is no evidence here that Plaintiffs have exhausted their remedies under Nepalese law.
The Seventh, Ninth, and D.C. Circuits have all held that "the FSIA does not contain a statutory
exhaustion requirement." Abelesz v. Magyar Nemzeti Bank, 692 F.3d 661, 681 (7th Cir. 2012)
(citing Cassirer v. Kingdom of Spain, 616 F.3d 1019, 1034-37 (9th Cir. 2010) (en banc); Agudas
Chasidei Chabad of U.S. v. Russion Fed'n, 528 F.3d 934, 948-49 (D.C. Cir. 2008)). The
Seventh Circuit has held, however, that a prudential exhaustion requirement exists based on
international law principles, and therefore "'a claimant cannot complain that a 'taking' or other
economic injury has not been fairly compensated, and hence violates international law, unless
the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged
to have caused the injury.'" Abelesz, 692 F.3d at 681 (quoting Millicom Int'l Cellular, S.A. v.
Republic of Costa Rica, 995 F. Supp. 14, 23 (D.D.C. 1998)); see also Republic of Austria v.
Altmann, 541 U.S. 677, 714 (2004) (Breyer, J., concurring) ("A plaintiff who chooses to litigate
in this country in disregard of the post[-]deprivation remedies in the 'expropriating' state may
have trouble showing a 'tak[ing] in violation of international law.'"). Neither the Ninth Circuit
nor the D.C. Circuit reached the issue. Given the doctrinal uncertainty in this area and the
absence of relevant Second Circuit authority, this Court does not reach this issue.

by dismissal of the action." (citation omitted)). The Clerk of the Court is directed to close this

case.

Dated: New York, New York  
September 2, 2014

SO ORDERED.

Paul S. Gardephe

Paul G. Gardephe  
United States District Judge